IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| RYAN W. HACKMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 13-4161-CV-C-ODS |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING
## COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying his application for supplemental security income ("SSI") benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff filed his application for SSI benefits in August 2010 and alleged an onset date of December 1, 2005. However, SSI benefits are not available before the claim is filed, so the focus is on Plaintiff's condition after the date of filing.

Plaintiff was born in February 1980, completed high school and (at most) two semesters of community college. The ALJ determined Plaintiff had no prior relevant work experience. The ALJ also found Plaintiff suffered from the following severe conditions: hypogonadism, neurogenic bladder dysfunction, dizziness, depression, anxiety, and attention deficit disorder ("ADD"). The evidence and the ALJ's discussion of these issues are outlined below.

## A. Hypogonadism

Hypogonadism is also known as low testosterone. It is not clear when Plaintiff was initially diagnosed with this condition, and Plaintiff does not discuss the point. There is only one medical record related to this condition (or, at least, only one identified by the parties or the ALJ): it is a record from December 16, 2011 acknowledging Plaintiff's prior diagnosis of low testosterone, that he had been receiving various treatments, and that Plaintiff "felt somehow better after treatment has started." R. at 463. However, at that appointment it was decided to "discontinue testosterone replacement to further investigate the etiology of hypogonadism" and tests were scheduled for shortly thereafter. R. at 466. The administrative hearing was held on January 20, 2012. No records after December 16, 2011 were submitted either before or after the hearing.

The December 16 record indicates Plaintiff's low testosterone caused Plaintiff to feel fatigued and this was Plaintiff's "main concern." Plaintiff was also treated by Dr. Sosonmolu Shoyinka for his anxiety and depression; in assessing Plaintiff's condition Dr. Shoyinka indicated (in January 2012) Plaintiff's "limitations are mostly related to severe chronic fatigue. Low energy levels make it difficult to concentrate and/or function at any task in a sustained fashion." R. at 443. At the hearing, Plaintiff frequently referred to his fatigue and described it in rather extreme terms.

## B. Polyuria

Plaintiff suffers from a neurogenic bladder disorder that manifests itself in polyuria; that is, urinary urgency and frequency.[1] Plaintiff underwent implantation of an InterStim nerve stimulator in September 2009, and this provided almost immediate relief initially, but by late 2009 its effectiveness had diminished. Some adjustments were made to the device in November 2009. R.at 271-73. In May 2010 Plaintiff reported "severe nocturia," indicating the problem was more severe at night. R. at 404. In July

---

[1] Incontinence is differentiated from polyuria in that incontinence involves the accidental leakage of urine.

2010 – before he applied for benefits – Plaintiff reported that the nocturia had improved to every ninety minutes and "[d]uring the day, he voids about every 2 hours." R. at 405. In November 2011 his condition persisted but had improved every two hours at night. R. at 452-53. At the hearing, Plaintiff testified he woke up hourly. R. at 53-54.

### C. Dizziness

Plaintiff complained of dizziness in November 2009, but an MRI and neurological exam were unremarkable. R. at 296-97, 313-14. Thereafter, (as described by the ALJ) Plaintiff complained of dizziness "intermittently" – in August 2010, December 2010, February 2011, March 2011, and December 2011. R. at 26. The ALJ declared that he "considered the claimant's intermittent dizziness when determining that he should avoid hazards, such as moving machinery and unprotected heights, and cannot climb ladders, ropes or scaffolds." R. at 26. In this proceeding Plaintiff reiterates his dizziness, but does not specifically contend the ALJ failed to properly account for it as described.

### D. Anxiety/Depression/ADD

Plaintiff has undergone counseling and treatment for anxiety, depression and ADD at various places since before he filed for benefits. Rather than trace his entire history, the Court will begin its discussion with the December 2009 report from University Hospital, which indicates he had been treated there for a year. On this date, however, Plaintiff presented with "worsening anxiety." The doctor prescribed Ritalin and Ativan. Plaintiff was to return in two weeks for evaluation of the medications' effectiveness. R. at 268-69. There is no indication whether Plaintiff returned in two weeks; the next record Plaintiff points to is from May 25, 2010, at which time Plaintiff reported that he was not taking the medication (Wellbutrin and Lorazepam) that he had been prescribed but expressed a desire "to get back on Wellbutrin XL as that has seemed to work best for him." Plaintiff was prescribed Wellbutrin and Lorazepam (a/k/a Ativan) and instructed to return in four to six weeks. R. at 266-27. On August 11, 2010 (the next visit to which the Court has been directed), Plaintiff was described as having

3

"inconsistently treated generalized anxiety with depression. Plaintiff was encouraged to undergo counseling and to start taking Buspirone (which was apparently prescribed at that time). R. at 261-63.

As noted earlier, Plaintiff filed for benefits on August 25, 2010. On October 19, 2010, Plaintiff indicated he was seeing a counselor and asked for a prescription for Wellbutrin. This request was granted. R. at 396-97. Ten days later Plaintiff reported the "Wellbutrin helped some but . . . he is always anxious, he is always worried and he is not really able to enjoy his life . . . ." The need to see a psychiatrist and go to counseling was discussed "at length with him," and he was told to continue Wellbutrin and Lorazepam. R. at 398-99.

In November 2010, Dr. Lester Bland (a psychologist) performed a consultative review of Plaintiff's records. He opined that Plaintiff was moderately limited in his ability to understand, remember, carry out detailed instructions and maintain attention and concentration for extended periods of time, accept instructions and respond to criticism from supervisors, respond to changes in the work setting, and travel in unfamiliar places or use public transportation. In all other areas Dr. Bland indicated Plaintiff was not significantly limited. Dr. Bland also wrote that Plaintiff could "understand, remember, and carry out short and simple instructions. He may ha[ve] difficulty adapting to some changes in the work place. He can make simple work-related decisions. He would not be expected to have significant difficulties relating to authority figures and co-workers. R. at 354-56.

Plaintiff has records from Burrell Behavioral Health ("Burrell") dated from December 2010 to November 2011, but his treatment there did not last the entire time period. In December 2010, Plaintiff said that he felt "[a]nxious on and off" and his mood was "average." He reported difficulties with concentration, nervousness, dizziness, and muscle tension. Plaintiff's GAF was assessed at 52; his valium dosage was increased and he was directed to continue taking Wellbutrin. R. at 385-86. In January 2011, Plaintiff expressed a desire to stop taking all medications, but the matter does not appear to have been resolved and no other report of significance appears. R. at 388-89. In March, Plaintiff reported "feeling okay" with "[s]ome tiredness." He said he had been tapering off Wellbutrin. It was suggested that if he was going to stop taking

4

Wellbutrin he should start another antidepressant, but Plaintiff indicated he was unwilling to do so. Nonetheless, a prescription for Zoloft was written – although Plaintiff reiterated that he did not intend to use it. R. at 390-91. In May, Plaintiff reported that he was completely off Wellbutrin and was taking the Zoloft. R. at 392-93. The next report from Burrell is approximately six months later. By this time (as discussed in the following paragraph) Plaintiff had begun seeing Dr. Shoyinka. In contrast to Dr. Shoyinka's reports, Burrell's report intimates Plaintiff "cannot manage his anxiety and his medications" and that valium was "too sedating." Beyond this, the November 2011 report says very little. R. at 426-41.

In July 2011, Plaintiff saw Dr. Shoyinka, apparently (because the Court cannot find an earlier record of a visit to Dr. Shoyinka) for the first time. He was not taking his Ritalin, R. at 413, and was taking the Zoloft Burrell had prescribed. R. at 414. Plaintiff reported that he was "most helped by" Wellbutrin. R. at 414. Dr. Shoyinka assessed Plaintiff as suffering from anxiety and depression and determined Plaintiff's GAF score was 65. He altered Plaintiff's dosage of Zoloft and indicated he would consider prescribing Wellbutrin at the next visit. R. at 416. The following month, Plaintiff reported "doing better since" his last visit and the changes to his Zoloft regimen. He reported increased energy and motivation and less fatigue. Dr. Shoyinka increased Plaintiff's GAF score to 70-75. He also prescribed Wellbutrin, and supplied a prescription for Ativan to be used if needed. R. at 418-20. At Plaintiff's next appointment in October, Plaintiff reported that he had not needed to take the Ativan. He reported "being very tired and sleepy" and "feeling 'like a zombie' with reduced motivation." Dr. Shoyinka instituted a plan to taper Plaintiff off Zoloft and to increase Wellbutrin. R. at 422-24. In December 2011, Plaintiff "state[d] that since he switched to Wellbutrin his anxiety symptoms are much better controlled. . . . His main concern today is still chronic fatigue." Plaintiff then discussed his diagnosis and treatment for low testosterone. Dr. Shoyinka determined Plaintiff's GAF was 55-65 "[f]or medical reasons mostly." R. at 458-60.

On January 9, 2012, Dr. Shoyinka completed a Medical Source Statement – Mental. On this form, Dr. Shoyinka indicated Plaintiff had a "good" (defined as limited, but satisfactory) ability to follow rules, relate and interact with co-workers, the public and

5

supervisors, use judgment, function independently, and maintain attention or concentration.  He described Plaintiff's ability to deal with work stresses as "fair" (which was defined as "seriously limited, but not precluded)."  Dr. Shoyinka also indicated Plaintif had a "good" ability to maintain personal appearance, relate predictably in social situations, and demonstrate reliability, and a "fair" ability to behave in an emotionally stable manner.  Plaintiff also had an "unlimited/very good" ability to understand, remember, and carry out instructions of all sorts.  However, any limitations that were reflected in Dr. Shoyinka's assessment were *not* related to Plaintiff's depression, anxiety or ADD.  Dr. Shoyinka wrote that Plaintiff's "limitations are mostly related to severe/chronic fatigue.  Low energy levels make it difficult to concentrate and/or function at any task in a sustained fashion."  Elsewhere, he wrote that Plaintiff's "severe anxiety interefres with [Plaintiff's] concentration but does not limit his functioning.  No marked cognitive deficits."  R. at 443-44.

### E.  Residual Functional Capacity

The ALJ found Plaintiff had the residual functional capacity ("RFC") to perform a range of sedentary work except he could not climb ladders, ropes or scaffolds, needed to avoid hazards such as moving machinery, needed to work in proximity to a bathroom.  The RFC also states Plaintiff could understand, remember, and carry out simple instructions, deal with ordinary changes in a work setting, and tolerate only occasional interaction with coworkers, supervisors, and the public.  R. at 24.  In reaching this decision, the ALJ noted Plaintiff's primary complaint seemed to be fatigue.  The fatigue was related to Plaintiff's low testosterone, and the ALJ found that the medical record demonstrated this condition – regardless of its cause – was amenable to treatment that improved his condition, and that a treatable condition is not disabling.  R. at 25.  With respect to Plaintiff's polyuria, the ALJ opted to credit Plaintiff's nearly-contemporaneous statement to the doctor two months prior to the hearing, which indicated Plaintiff needed to urinate approximately every two hours.  With respect to dizziness, the ALJ found Plaintiff had not indicated to his doctors that dizziness limited in any way, and that

6

dizziness was accounted for in the RFC by declaring that Plaintiff could not work at heights or near machinery. R. at 26.

With respect to Plaintiff's anxiety and depression, the ALJ found Plaintiff's most serious problems arose when Plaintiff was not compliant with his medication. The ALJ also found it significant that Dr. Shoyinka indicated Plaintiff's primary problems were physical, not mental/emotional, and that Dr. Shoyinka indicated Plaintiff attributed minimal limitations to the conditions he was treating. R. at 27-28.

A vocational expert ("VE") testified that a person with Plaintiff's RFC would be able to work as an addresser, document preparer, or weight tester. The VE also testified a person with Plaintiff's RFC and who also needed to lie down for one hour during the workday could not work. She also testified that if a person with the Plaintiff's RFC and who also would miss half of the regular work "due to just an inability to leave the house" could not work. R. at 82-83.

Additional facts will be discussed as necessary in the discussion of the legal challenges Plaintiff has raised.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

A.

Plaintiff presents two arguments; for ease of discussion the Court elects to address the second one first. Plaintiff contends the ALJ erred in affording Dr. Bland's opinion "significant weight" while affording Dr. Shoyinka's opinion "partial weight." The Court concludes there was no error.

First, in assigning Dr. Shoyinka's opinion partial weight, the ALJ specified he was giving Dr. Shoyinka's opinion regarding Plaintiff's fatigue partial weight because (1) this aspect of Dr. Shoyinka's opinion was based solely on Plaintiff's reports and (2) Dr. Shoyinka was not treating Plaintiff's fatigue. The ALJ further declared that he would give considerable weight to the opinion from doctors treating Plaintiff's fatigue. R. at 30. "The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians." Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted). When evaluating Plaintiff's fatigue, the ALJ was permitted to afford more weight to the doctors treating that condition.

With respect to the matters Dr. Shoyinka *was* treating, the RFC is very similar to Dr. Shoyinka's Medical Source Statement. Significantly, Dr. Shoyinka opined that Plaintiff's limitations were mostly related to fatigue and not to the conditions he was treating. Plaintiff does not identify any of Dr. Shoyinka's opinions regarding depression or anxiety that would have altered the RFC, and the Court discerns no error.

B.

Plaintiff's other argument contends the ALJ erred in discounting Plaintiff's credibility. The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the

8

> impairment and the degree of claimant's subjective complaints need not
> be produced. The adjudicator may not disregard a claimant's subjective
> complaints solely because the objective medical evidence does not fully
> support them.
>
> The absence of an objective medical basis which supports the degree of
> severity of subjective complaints alleged is just one factor to be
> considered in evaluating the credibility of the testimony and complaints.
> The adjudicator must give full consideration to all of the evidence
> presented relating to subjective complaints, including the claimant's prior
> work record, and observations by third parties and treating and examining
> physicians relating to such matters as:
>
>   1. The claimant's daily activities;
>   2. the duration, frequency and intensity of the pain
>   3. precipitating and aggravating factors;
>   4. dosage, effectiveness and side effects of
>      medication;
>   5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective
> complaints solely on the basis of personal observations. Subjective
> complaints may be discounted if there are inconsistencies in the evidence
> as a whole.

739 F.2d at 1322. While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

In evaluating Plaintiff's credibility, the ALJ noted a variety of factors. He noted that Plaintiff was not always compliant with medication, R. at 27, which undercut his testimony that anxiety and depression (combined with fatigue, which will be discussed in a moment) rendered him unable to leave his parents' basement. E.g., Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) (ALJ may consider compliance with physician's directions). He noted Plaintiff's poor work history, which suggested "that his current unemployment, may, in fact, be a lifestyle choice, and not a result of his impairments." R. at 28. A poor record history may be considered as indicating a potential lack of motivation to work and, in turn, a basis for disbelieving a claimant's testimony. E.g., Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). The ALJ relied on Plaintiff's medical records to incorporate the limitations caused by Plaintiff's

polyuria, depression, and anxiety after those conditions were treated.  E.g., Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (holding limitations alleviated by treatment are not disabling).  In this regard, Plaintiff's testimony at the hearing conflicted with his statements to – and the conclusions of – his treating physicians, which provided an additional basis for discounting his credibility.  E.g., Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006).  Finally, the ALJ considered Plaintiff's activities, which included: "perform[ing] multi-step household chores (such as doing the laundry and mowing the lawn," driving, using and playing games on a computer, watching sporting events on television, reading, preparing meals, taking walks, lifting weights, and engaging in other activities from time to time.  R. at 22-23 (incorporated into the credibility discussion by R. at 28).

Plaintiff particularly takes the ALJ to task for concluding Plaintiff's fatigue was amenable to treatment.  He argues the ALJ erred in relying on the December 16, 2011 report indicating treatment made him feel "somehow better" and describes this as a poor basis for discounting Plaintiff's credibility.  To the contrary, this report stands in stark contrast to the extreme fatigue Plaintiff described in his testimony, and this inconsistency provides a legitimate basis for discounting Plaintiff's testimony.  Moreover, there is no medical evidence suggesting that, with treatment, Plaintiff would be expected to have the degree of fatigue he described in his testimony.  The task of weighing credibility factors falls on the ALJ, not the District Court.  E.g., Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

The ALJ gave good reasons for discounting Plaintiff's credibility that are consistent with Polaski.  Accordingly, the ALJ's decision is entitled to deference.  E.g., Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012).

### III.  CONCLUSION

The Commissioner's final decision denying benefits is affirmed.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: April 30, 2014　　　　　　　　　　UNITED STATES DISTRICT COURT